UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                    :

ACCELERANT PARTNERS, LLC,               :

                             Plaintiff,       :

                                                :             21-cv-5014 (LJL)

        -v-                             :

                                                :        OPINION AND ORDER

APPLIED FIBER HOLDINGS, LLC,       :

                                                :

                            Defendant.    :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Applied Fiber Holdings, LLC ("Defendant" or "Applied Fiber") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint ("Complaint") of Plaintiff Accelerant Partners, LLC ("Plaintiff" or "Accelerant") for failure to state a claim for relief.  Dkt. No. 9.

      For the following reasons, the motion to dismiss is denied.

## BACKGROUND

      The Court accepts as true the well-pleaded allegations of the Complaint, as well as the documents incorporated by reference, for purposes of the motion to dismiss.[1]

---

[1] With its opposition to the motion to dismiss, Applied Fiber improperly references, and submits an affidavit containing, facts not included within the four corners of the Complaint.  *See, e.g.*, *Lora v. Centralized Mgmt. Serv., Inc.*, 2020 WL 3173025, at *2 (S.D.N.Y. June 12, 2020) (holding that on a motion to dismiss, a court may not consider factual averments contained in affidavits); *Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 451 (S.D.N.Y. 2014) (holding that a complaint cannot be amended by briefs in opposition to a motion to dismiss).

## I.      The Relevant Parties

Defendant Applied Fiber is a Florida company that is the leading provider of terminated

synthetic tension systems.  It engineers and manufactures rope, cable, and cord assembly

products, which create new structural alternatives for steel and high-strength tension

applications.  Dkt. No. 1 ("Compl.") ¶ 7.

Plaintiff Accelerant is a consulting and investment firm that focuses on accelerating

strategies, solutions, and liquidity for its clients in connection with control investments, minority

investments, restructurings, turnarounds, operational enhancements, and mergers and

acquisitions.  *Id.* ¶ 6.  Its members include Michael Borom ("Borom") and Michael Kirby

("Kirby").  *Id.* ¶ 2.

## II.     The Agreements Between Applied Fiber and Accelerant

On or about April 18, 2018, Applied Fiber entered into an agreement (the "Initial

Agreement") with Borom to provide advisory services to Applied Fiber "in connection with the

possible monetization of the Company through a sale or licensing of all or a portion of the assets

of the Company."[2]  *Id.* ¶ 11; Dkt. No. 11-1.  Borom agreed that he or his associates would

provide advice and assistance in connection with a potential transaction and that Borom's fee

would be dependent on the outcome of the assignment and would be based on the pre-tax

proceeds of either the sale of stock or assets or the licensing of assets, licensing agreements, or

manufacturing agreements.  Dkt. No. 11-1 at 2.  The parties also agreed Borom would receive

$100,000 "upon any transaction in which the Proceeds [we]re up to $30.1 million," that 100% of

the Proceeds above $30.1 million and up to $30.6 million would be paid to Borom, that he would

---

[2] Throughout the Initial Agreement and the Revised Agreement, "Company" is defined as
Applied Fiber, together with its subsidiaries and affiliates.  The Court refers to Applied Fiber and
the Company interchangeably in this Opinion.  For the purposes of this Opinion, the Court also
adopts the definition of the term "Proceeds" contained in the agreements.

receive a fee of 2% of the next $19.4 million above $30.6 million, and that he would receive 100% of the proceeds above $50 million and up to $50.5 million and 10% of the Proceeds in excess of $50.5 million.  *Id.* at 2–3.

Borom began performing under the Initial Agreement in May 2018.  Compl. ¶ 28.  On May 3, 2018, he and Kirby incorporated Accelerant.  *Id.* ¶ 22.

On June 24, 2019, Accelerant and Applied Fiber entered into a revised engagement letter (the "Revised Agreement"), which the parties agree is the operative agreement in this case. *Id.* ¶ 23; Dkt. No. 11-2.  The Revised Agreement superseded and replaced the Initial Agreement entered into between Borom and Applied Fiber.  Compl. ¶ 23.  In the Revised Agreement, Applied Fiber engaged Accelerant "in connection with the possible monetization of [Applied Fiber] through a sale or licensing of all or a portion of the assets of [Applied Fiber]."  Dkt. No. 11-2 at 2.  Accelerant agreed to provide Applied Fiber "with advice and assistance in connection with this potential transaction, which may include performing financial analyses, providing strategic and operational advice to optimize value, searching for a purchaser acceptable to [Applied Fiber], coordinating visits of potential purchasers and assisting [Applied Fiber] in negotiating the financial aspects of the transaction."  *Id.*  The Revised Agreement provided that "[t]he fees for the engagement [would] depend on the outcome of this assignment" and would "be based upon pre-tax proceeds received by the Company, the shareholders of the Company (the 'Shareholders'), management and/or parties receiving value associated with (i) the sale of stock or assets or the licensing of assets, including but not limited to intellectual property ('IP'), (ii) licensing agreements (one time payments and royalties) and/or (iii) manufacturing agreements done in conjunction with licensing agreements, before any transaction expenses ('Proceeds')."  *Id.* at 2–3.

The fees due to Accelerant fell into four categories: (1) an advisory retainer of "$400,000 plus $40,000 for each month starting July 1, 2019 . . . during which [Accelerant was] actively engaged with [Applied Fiber]," the payment of any partial month to be prorated to the closing (the "Deferred Retainer"); (2) a "bonus" of $100,000 to be paid "if or when Proceed values exceed $30 million"; (3) an additional payment of 8% "of Proceeds that exceed $30 million but are below $50 million"; and (4) 10% of "all Proceeds in excess of $50 million." *Id.* The third and fourth categories are accompanied by illustrations. With respect to the third category, the Revised Agreement explains, "for example, $400k shall be paid in addition to the above [Categories 1 and 2] for realizing $35M Proceeds." *Id.* at 3. In the case of category four, the Revised Agreement explains, "for example $60 million = 20M x 8% plus 10M x 10% for a total of $2.6 million to be paid in addition to items 1 and 2." *Id.* The Revised Agreement further sets forth the mechanism for calculating Proceeds. In the case of "the sale, exchange or purchase of the Company's equity securities," Proceeds would constitute "the total consideration paid for such securities . . . plus the principal amount of all indebtedness for borrowed money" on Applied Fiber's books. *Id.* In the case of "a sale or disposition by the Company of assets," the Proceeds would be "the total consideration paid for such assets, plus the net value of any current assets not sold by the Company and the principal amount of all indebtedness for borrowed money assumed by the purchaser." *Id.* In the case of a licensing and manufacturing agreement, the Proceeds would be "the total consideration paid for such agreements net of the cost to satisfy such agreements." *Id.*

The Revised Agreement contains a "tail" provision. Applied Fiber had the right "at any time with or without cause" to terminate Accelerant's services. *Id.* at 4. However, in the event of a termination, Accelerant still would be "entitled to the applicable fees set forth above in the

event that at any time prior to the expiration of two years after such termination (i) an Agreement is entered into with respect to the sale of all or a portion of the stock or assets of the Company which is eventually consummated or termination (and for which the Company receives as a Payment) or (ii) a licensing agreement is entered into and Proceeds are eventually received."[3]  *Id.*

The critical language for purposes of the instant motion addresses how, and under what conditions, Applied Fiber would be paid its fee.  It states in whole:

> Except as provided herein, the transaction fee will be paid to us [i.e., Accelerant] in cash as part of the distribution of the Proceeds.  Fees #1 and #2 above are contingent upon the sale of the Company and subject to the 2-year post-termination expiration limit as set forth below.  Fees #3 and #4 above shall be paid in accordance with Company shareholder form, terms, and conditions.  For example, if stock, tiered payments, or earnout are part of the transaction Proceeds, #3 and #4 will carry the same payment form, terms, and conditions.

*Id.* at 3.

## III.    The BBRG Transaction

Beginning in May 2018, Borom was actively involved with Applied Fiber to facilitate its monetization through a sale or licensing of all or a portion of the Company's assets.  Compl. ¶ 28.  Borom and Accelerant's engagement included, but was not limited to, participating in strategy sessions with the Company, creating ownership models for potential purchasers, assisting the Company with the redesign of its production facility, creating a valuation model, setting up a data room, preparing pitch materials and pitching potential purchasers and investors, and following up with potential purchasers and investors after pitch meetings. *Id.* ¶ 29.  Among the potential investors which Accelerant pitched was Bridon Bekaert Ropes Group or BBRG, a supplier of mission-critical advanced cords and ropes.  *Id.* ¶ 30.

---

[3] The Revised Agreement provides that "[i]n the case of a licensing agreement, all proceeds associated with such licensing agreement(s) shall be considered."  *Id.*

On March 3, 2020, Applied Fiber notified Accelerant that it was no longer actively pursuing a sale and, therefore, no longer required Accelerant's services.  *Id.* ¶ 31.  On November 30, 2020, within the two-year tail period under the Revised Agreement, Applied Fiber and BBRG signed a technology licensing agreement pursuant to which Applied Fiber licensed its patented high-capacity fiber rope termination technology to BBRG, which would use the technology to produce high strength fiber rope assemblies for mining, offshore, and industrial-lifting markets.  *Id.* ¶ 32.

## IV.    Applied Fiber's Alleged Breach of the Revised Agreement

On November 25, 2020, Accelerant set Applied Fiber a demand letter (the "Demand Letter") seeking payment under the Revised Agreement.  *Id.* ¶ 34.  The Demand Letter claimed a licensing agreement was considered a sale under the Revised Agreement and demanded that Accelerant be paid its $400,000 Deferred Retainer and its advisory fee from July 1, 2019 to mid-March 2020, for a total fee of $720,000.  Dkt No. 1-1.

On February 9, 2021, Applied Fiber responded to the Demand Letter by denying that Applied Fiber owed any payment to Accelerant under the Revised Agreement (the "Response").  Compl. ¶ 38.  Applied Fiber claimed that Accelerant was due its deferred advisory retainer only upon the sale of the Company and that a licensing agreement was not a sale of the Company.  Dkt. No. 1-2.  The Response stated, "we mutually understood that our objective was to sell the company, that you had been hired to help sell the company, and that your compensation was to be tied to the sale of the company."[4]  *Id.*

---

[4] The Response also asserted that Accelerant's entitlement to compensation for a sale transaction within two years of the termination of the agreement was not unconditional and that it was "arguably extinguished" by Accelerant's March 2020 notice that it would not be providing additional services without a new deal structure.  Dkt. No. 1-2.  That issue is not before the Court on this motion to dismiss.

On April 21, 2021, Accelerant, through outside counsel, sent Applied Fiber a second demand letter (the "Second Demand Letter") again seeking payment of the $720,000 under the Revised Agreement.  Compl. ¶ 39; Dkt No. 1-3.  The Second Demand Letter emphasized that Accelerant's engagement was to provide advice in connection with "a sale or licensing" of Applied Fiber's assets.  Dkt. No. 1-3.  Applied Fiber responded on May 18, 2021, denying that it owned any payment to Accelerant pursuant to the Revised Agreement.  Compl. ¶ 41.

## PROCEDURAL HISTORY

Accelerant filed suit in this Court on June 7, 2021, claiming breach of contract.  Dkt. No. 1.  Applied Fiber filed this motion to dismiss on July 8, 2021.  Dkt. Nos. 9–11.  Accelerant filed a memorandum in opposition to the motion on August 12, 2021, Dkt. No. 23, and Applied Fiber filed a reply memorandum in further support of its motion on August 26, 2021, Dkt. No. 24.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

On a motion to dismiss, a "complaint 'is deemed to include any instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Roeder v. J.P. Morgan Chase & Co.*, 2021 WL 797807, at *11 n.9 (S.D.N.Y. Feb. 26, 2021) ("In reviewing a Rule 12(b)(6) motion, the Court may consider 'facts alleged in the complaint and documents attached to it or incorporated in it by reference' and 'documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference.'" (quoting *in re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008))).

## DISCUSSION

Applied Fiber moves to dismiss the Complaint for failure to state a claim for relief. For purposes of the motion, it admits that the Revised Agreement between it and Accelerant stated binding obligations, that Accelerant performed its obligations under the Revised Agreement, and that it did not pay Accelerant any fee for its services. It argues, however, that under the clear and unambiguous language of the Revised Agreement, a "sale of the Company" or a "Company sale transaction" was a condition precedent to Applied Fiber's obligation to pay either the Deferred Retainer or the monthly advisory fee and that an agreement to license Applied Fiber's assets is not a "sale of the Company." It thus argues that even accepting all of Accelerant's allegations as true, it does not owe Accelerant the Deferred Retainer or the advisory fee and it has not breached the Revised Agreement.

There are four elements to a breach of contract claim under New York law: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Mancuso v. L'Oreal USA, Inc.*, 2021 WL 1240328, at *3 (S.D.N.Y. Apr. 2, 2021) (internal quotation marks omitted) (quoting *Ellington*

*Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011 (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996))).  "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations."  *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't 2009) (internal quotation marks omitted) (quoting *Franklin Apt. Assoc., Inc. v. Westbrook Tenants Corp.*, 841 N.Y.S.2d 673 (2d Dep't 2007)); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at \*6 (S.D.N.Y. Aug. 21, 2018).  "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Willsey*, 885 N.Y.S.2d at 530 (internal quotation marks omitted) (quoting *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002)); *see also IDT Corp. v. Tyco Grp., S.A.R.L.*, 918 N.E.2d 913, 916 (N.Y. 2009); *Beach*, 2018 WL 3996931, at \*6.

Under New York law, a condition precedent is "an act or event . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 46 (2d Cir. 2020) (internal quotation marks omitted) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995)); *see also Thomas & Betts Corp. v. Trinity Meyer Utility Structures, LLC*, 2021 WL 4302739, at \*2 (2d Cir. Sept. 22, 2021).  Where "a contract imposes a condition precedent to performance, a party cannot establish a breach unless it can show that it satisfied the condition." *Darbai v. Lenox Hill Hosp., Inc.*, 2011 WL 1226269, at \*3 (S.D.N.Y. Mar. 24, 2011).

The parties agree that under the Revised Agreement, a "sale of the Company" or a "Company sale transaction" was a condition precedent to Applied Fiber's obligation to pay Accelerant its Deferred Retainer and its monthly advisory fee and that in the absence of such an

event, Applied Fiber had no obligation to pay either sum to Accelerant.  They differ, however, on the meaning of the language "sale of the Company" and whether it is clear and unambiguous.  Applied Fiber claims it is clear and unambiguous, and no fee is owed.  According to it, the word "sale" has a definite and precise meaning in the dictionary—the transfer of property or title for a price—and "Company" is a defined term under the Revised Agreement, referring to Applied Fiber and its affiliates and subsidiaries.  Thus, only the transfer of Applied Fiber or title to it for a price, and not a licensing agreement, constitutes a "sale of the Company" and triggers Applied Fiber's obligations with respect to the Deferred Retainer and the monthly fee.

Accelerant argues that the term is at least ambiguous, if it is not clear and unambiguous in Accelerant's favor.  It points out that it was engaged to advise in connection with either a sale or a licensing transaction and that the Proceeds from which its fee was to be paid, "upon a Company sale transaction," include consideration paid for a licensing or manufacturing agreement (net of the costs to satisfy those agreements) in addition to consideration from the sale of the Company or sale of the Company's assets or equity securities.  Thus, reading the agreement as a whole, it says that "Company sale transaction" must include a licensing or manufacturing agreement.  Accelerant's argument is, in essence, that "Company sale transaction" is shorthand for any transaction that accomplishes the goal of the assignment to sell or license all or a portion of the assets of the Company.[5]

Under New York law, "[a] contract should be read as a whole, with every part interpreted with reference to a whole."  *Granfield II, LLC v. Kohl's Dep't Stores, Inc*, 83 N.Y.S.3d 66, 69 (2d Dep't 2018); *see also Thomas & Betts*, 2021 WL 4302739, at *3.  A court should ensure

---

[5] For purposes of this motion, neither party suggests that there is any difference between the language "Company sale transaction" and "sale of the Company."

"that undue emphasis not placed upon particular words and phrases." *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007). "[W]hen interpreting [a] contract [the court] must consider the entire contract and choose the interpretation [of the clause] 'which best accords with the sense of the remainder of the contract.'" *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 126 N.E.2d 271, 273 (N.Y. 1955)). "However, 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" *Bailey*, 868 N.E.2d at 959 (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)). "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (alteration omitted) (quoting *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)); *see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). "Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Hunt Ltd.*, 889 F.2d at 1277 (internal quotation marks omitted) (quoting *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985)). Moreover, "[t]he question of 'whether the language of a contract is clear or ambiguous' is one of law, and therefore must be decided by the court." *Federal Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (quoting *Compagnie Financiere de CIC et de L'Union Europienne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd.*, 889 F.2d at 1277 (2d Cir. 1989); *see also Estate of*

*Clerk v. Companion Life Ins. Co.*, 712 F. App'x 113, 114 (2d Cir. 2018) (summary order). Nor can a party resort to extrinsic evidence or trade custom or usage to contradict or qualify language that is otherwise unambiguous. *Hunt*, 889 F.2d at 1277–78.

Each party here tenders an interpretation of the Revised Agreement that is at least reasonable. Viewing the language of "Company sale transaction" or "sale of the Company" in isolation, the language plainly supports Applied Fiber's interpretation. A sale is different from a license. Moreover, the Revised Agreement elsewhere separately refers to sales, licensing agreements, and manufacturing agreements. The parties easily could have stated that the advisory retainer was to be paid upon a sale or entry into a manufacturing or licensing agreement or made "Company sale transaction" a defined term that included a sale of some or all of Applied Fiber or its assets or a licensing or manufacturing agreement. That the parties did not do so tends to support Applied Fiber's interpretation of the Revised Agreement.

On the other hand, a review of the Revised Agreement as a whole renders Accelerant's interpretation at least reasonable. Accelerant was retained to provide advice both with respect to a sale of all or some of Applied Fiber or a licensing of some or all of its assets. Accepting Applied Fiber's literal interpretation of the Revised Agreement, unless there was a sale of all of Applied Fiber, Accelerant would not be entitled to either the advisory retainer or the "bonus" of $100,000. It would receive a fee for its work in securing a sale of some of the assets or in securing a licensing or manufacturing agreement only if Applied Fiber realized at least $30 million from such a transaction—in which event it would receive 8% of the first $20 million in excess of the $30 million. There is force to Accelerant's argument that such an interpretation fails to give "practical interpretation to the language employed" and falls far outside "the parties' reasonable expectations." *Willsey*, 885 N.Y.S.2d at 530. There is at least a question whether in

the parties' reasonable expectations any licensing or manufacturing agreement or any sale of less than all of the Company's assets would ever yield more than $30 million, essentially making Applied Fiber's agreement to pay Accelerant for advice on a licensing or manufacturing license illusory. In that view, the failure to make "Company sale transaction" a defined term would cut against Applied Fiber. The parties elsewhere used defined terms. Interpreting each clause and word of the Revised Agreement with reference to the whole, it is at least reasonable that the language defining the scope of Accelerant's assignment—advice in connection with "the possible monetization of the Company through a sale or licensing of all or a portion of the assets of the Company"—also should be read to define what the parties meant by "Company sale transaction" and to suggest that when the Revised Agreement referred later to a "Company sale transaction" it was intending to pick up all of the elements of a possible monetization—both a sale and a licensing.[6]

Accelerant's interpretation does not necessarily render the language "Company sale transaction" surplusage, as Applied Fiber contends. Dkt. No. 24 at 5. The sentence in which the language "[u]pon a Company sale transaction" appears ends with the provision that Accelerant be paid its advisory retainer "from Proceeds at closing." The reference to "Proceeds" in that sentence thus appears both to prescribe when Accelerant will be paid—only "at closing"—and to

---

[6] The phrasing of the language regarding the scope of Accelerant's assignment also calls into question one of Applied Fiber's other arguments. Applied Fiber argues that Accelerant's reading of "sale of the Company" leads to absurd results because the Company—*i.e.*, Applied Fiber and its subsidiaries and affiliates—cannot be licensed. But neither the paragraph defining the aggregate considered for purposes of calculating Proceeds nor the language defining Accelerant's obligation uses the language "sale of the Company" as such or even refers to the "sale of some or all of the Company's assets." The scope of Accelerant's assignment refers collectively to "a sale or licensing of all or a portion of the assets of the Company" as a single type of transaction; it does not refer separately to "a sale of assets" or "a licensing of assets." It therefore is reasonable that the language "Company sale transaction" was intended to pick up the whole of Accelerant's assignment and not just a portion of it.

limit the amount which Accelerant will be paid at that time—capping it at what Applied Fiber is due at closing.  On that reading, language elsewhere in the Revised Agreement takes on significance.  The Revised Agreement provides that "[f]ees on amounts paid into escrow will be payable upon the release of such escrow."  In other words, the reference to "Proceeds" in the sentence regarding the payment of the advisory retainer does work other than to make clear that Accelerant will be paid only if there is a transaction that would yield Proceeds, and thus the reference to "Company sale transaction" need not be read to refer only to a particular type of monetization transaction for that language to have independent meaning.  It can reasonably be read to refer to the condition precedent for Accelerant to be paid, while the reference to "Proceeds at closing" refers to when and up to how much Accelerant will be paid.

"When the language of a contract is ambiguous, its construction presents a question of fact, which precludes summary dismissal." *National Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 239 F. Supp. 3d 761, 784 (S.D.N.Y. 2017) (internal quotation marks and alterations omitted) (quoting *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007)).  Here, the language of the Revised Agreement is susceptible to two reasonable interpretations.  Accordingly, the motion to dismiss must be denied.

## CONCLUSION

For the reasons stated, the motion to dismiss is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 9.

SO ORDERED.

Dated: December 27, 2021
       New York, New York
                                                    _____
                                                    LEWIS J. LIMAN
                                                    United States District Judge